UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

|  |  |  |
|---|---|---|
| LINDA G. BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  4:10CV2300 FRB |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM AND ORDER

This cause is before the Court on plaintiff Linda G. Brown's appeal of an adverse ruling of the Social Security Administration.[1]  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

### I.  Procedural History

On August 1, 2007, plaintiff Linda G. Brown filed an application for Disability Insurance Benefits (also "DIB") pursuant to Title II, and/or for Supplemental Security Income (also "SSI") pursuant to Title XVI, of the Social Security Act, 42 U.S.C. §§ 401, et seq. (also "Act").  (Administrative Transcript ("Tr.") 122-34).  Plaintiff's applications were initially denied, and she requested a hearing before an Administrative Law Judge (also

---

[1]Missouri is one of several states participating in modifications to the disability determination process which apply in this case.  See 20 C.F.R. §§ 416.1406, 416.1466 (2011).  These modifications include, inter alia, the elimination of the reconsideration step in the administrative appeals process.  Therefore, plaintiff's appeal in this cause proceeded directly from the initial denial to the administrative law judge level.

-1-

"ALJ"), which was held on March 9, 2010.  (Tr. 25-52).  On May 21, 2010, the ALJ issued his decision denying plaintiff's claims.  (Tr. 11-20).

Plaintiff subsequently filed a Request For Review of Hearing Decision/Order with defendant agency's Appeals Council, seeking review of the ALJ's decision.  (Tr. 4).  On October 8, 2010, the Appeals Council denied plaintiff's request to review the ALJ's decision. (Tr. 1-3).  As the Appeals Council noted, (Docket No. 1), this means that the ALJ's determination stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  Plaintiff's Testimony

During plaintiff's administrative hearing, she was represented by counsel, and offered testimony on her own behalf. Plaintiff testified that she was born on October 25, 1962, had completed the twelfth grade, and had attended vocational school to study medical office technology.  (Tr. 32).  She was divorced in March of 2005.[2]  (Tr. 41).  When the ALJ asked plaintiff why she could not work, plaintiff replied:

> I have to continually stand up for a little while and then I have to sit down.  I can't carry my body weight.  My legs don't work right.  I don't know what that stems from, maybe it's from the back injury that I have. And now I've been diagnosed with dementia, my fiancé recognized that I was forgetting things, that scares me.  I just don't feel like I would be - what's that word, I'm so confused - helpful to anyone right now.

[2]The administrative record contains some references to plaintiff under her former surname, which was Laws.

-2-

(Tr. 33).

Plaintiff's attorney then referred to a February 6, 2008 letter from Mary Jane Mason, M.D., and asked plaintiff to identify Dr. Mason. (Id.) Plaintiff testified that Dr. Mason was "a primary care physician that I didn't see, I've seen a nurse practitioner all the time." (Id.) When the ALJ sought clarification, plaintiff testified that she saw Dr. Mason's nurse practitioner, and did not see Dr. Mason. (Tr. 34).

Plaintiff testified that a neurologist had done a pin prick test the preceding day which had revealed numbness on the inside of her right leg, and numbness on the outside of her left leg. (Tr. 37). Plaintiff testified that she had experienced problems with her legs since 2004, and that she had trouble walking and keeping up with people. (Id.) She testified that she could not "do steps" and that when descending stairs, her legs and knee felt weak. (Id.) She stated that she felt fatigued all of the time, and then stated "I think it does, I think it's contributing to my back, I haven't gotten any answers to why my legs don't work right." (Id.) Plaintiff testified that an orthopedic surgeon told her that she needed a partial knee replacement, and that another doctor had told her that she needed a total knee replacement. (Tr. 37-38).

Plaintiff testified that she had received treatment from a physician named Dr. Satterly, who had performed knee surgery and who also prescribed pain medication. (Tr. 39). Plaintiff testified that she had difficulty walking after that surgery.

-3-

(<u>Id.</u>)

Plaintiff testified that she had not worked since 2002. (Tr. 40). She testified that a bone popped out from the side of her leg, and that this had happened "ever since [she] hurt it back in 2002, or no, 19, 1984." (<u>Id.</u>) Plaintiff testified that she hurt her knee playing basketball, and also had a work injury while operating a sewing machine that required her to use both of her feet. (<u>Id.</u>) Plaintiff testified that she had to quit that job due to pain in her knees and feet, stating that she "couldn't hardly walk." (Tr. 39). From 2001 to 2002, plaintiff was self-employed as a dog breeder, but did not earn a substantial income. (Tr. 40).

Plaintiff testified that she could sit for "four of five minutes" and had to sit on her side. (Tr. 42). She stated that it was worse to stand, but that sitting hurt the lower part of her back. (<u>Id.</u>) She testified that the only way she got relief was by standing for a little while, and sitting for a little while. (<u>Id.</u>)

Plaintiff testified that she had trouble breathing, stating "if I've walked to the bathroom and back or if I go to the kitchen and back, I have trouble breathing, especially when I get around people that smoke or the heat, the heat bothers me really bad too." (<u>Id.</u>) She testified that she quit smoking in 2008. (Tr. 42).

Plaintiff testified that she had been diagnosed with major depression, stating that she was unable to take care of herself, had low self-esteem, felt worthless, and did not feel like living most of the time. (Tr. 45). She stated that she was

-4-

continually in pain and could not get out and do anything.  (Id.)
She testified that she was not able to work.  (Id.)

Plaintiff testified that she had problems with anxiety
and had experienced anxiety attacks.  (Tr. 46).  She stated that
she was taking Oxycodone,[3] Hydrocodone,[4] Atenolol,[5] Cymbalta,[6] and
Lyrica.[7]  (Tr. 46-47).  Plaintiff testified that the latter two
medications were used to control fibromyalgia, and that she had
been diagnosed with fibromyalgia the preceding week.  (Tr. 47).
Plaintiff testified that she also took Levalbuterol,[8] Ramelteon,[9]

---

[3]Oxycodone is an opiate analgesic used to relieve moderate to severe
pain.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682132.html

[4]Hydrocodone is used to relieve moderate to severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html

[5]Atenolol is used alone or in combination with other medications to
treat hypertension.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684031.html

[6]Cymbalta, or Duloxetine, is used to treat depression and generalized
anxiety disorder, and is also used to treat pain resulting from diabetic
neuropathy and fibromyalgia.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html

[7]Lyrica, or Pregabalin, is used to relieve neuropathic pain (pain from
damaged nerves) that can occur in the arms, hands, fingers, legs, feet, or
toes in diabetic patients, or in the area of a rash in patients with shingles.
It is also used to treat fibromyalgia.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605045.html

[8]Levalbuterol is used to prevent or relieve the wheezing, difficulty
breathing, and chest tightness caused by lung disease such as asthma and
chronic obstructive pulmonary disease or "COPD," a group of diseases that
affect the lungs and airways.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603025.html

[9]Ramelteon, also called Rozerem, is used to help patients who have
difficulty falling asleep.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605038.html

a cold sore remedy, Skelaxin,[10] Claritin,[11] Nexium,[12] and Zantac.[13] (Id.)

      The ALJ then heard testimony from Jennifer Sullivan, a Vocational Expert (also "VE"). Ms. Sullivan testified regarding plaintiff's past work and the classifications thereof as specified by the Dictionary of Occupational Titles ("DOT"). Ms. Sullivan testified that plaintiff's past work as a heel finisher (which plaintiff indicated was a job in which she covered the heels of shoes) was sedentary and semiskilled; her work as a sewing machine operator was light and unskilled; her work as an accounts receivable clerk was sedentary and skilled; and her work as a cashier was light and unskilled. (Tr. 48-49). Following the conclusion of the hearing, the ALJ held the record open for approximately 30 days to await additional medical information. (Tr. 51).

      B.  <u>Medical Records</u>

      On March 20, 2003, plaintiff saw Thomas F. Satterly, Jr., D.O., with complaints of low back pain since 1999 when she was

---

[10]Skelaxin, or Metaxalone, is a muscle relaxant used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682010.html

[11]Claritin, or Loratadine, is used to temporarily relieve allergy symptoms.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697038.html

[12]Nexium, or Esomeprazole, is used to treat gastroesophageal reflux disease (GERD), a condition in which backward flow of acid from the stomach causes heartburn and injury of the esophagus. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699054.html

[13]Zantac, or Ranitidine, is used to treat ulcers; GERD, and conditions where the stomach produces too much acid. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601106.html

"hugged to tight." [sic] (Tr. 393). She also complained of popping and hurting in her shoulders. (Id.) She saw Dr. Satterly again on July 25, 2003, and Dr. Satterly noted that an MRI revealed a ruptured disc at L4-5 to the right. (Tr. 395).

On January 16, 2004, plaintiff returned to Dr. Satterly with continued complaints with pain in her back, legs, and right shoulder. (Tr. 396). Dr. Satterly noted that examination revealed positive impingement signs, but did not reveal significant neurologic loss, muscle atrophy, or loss of strength. (Id.) Dr. Satterly performed injections, and ordered MRI testing. (Tr. 397). MRI of plaintiff's lumbar spine, performed on January 20, 2004, revealed mild degenerative changes, a mildly bulging disc at L2-3, and a concentric disc bulge at L4-5 and L5-S1. (Tr. 425-26). MRI of plaintiff's right shoulder showed impingement syndrome but no rotator cuff tear, and MRI of plaintiff's back showed some changes at L4-5 with spinal stenosis and foraminal stenosis. (Tr. 398). MRI of plaintiff's left knee revealed a tear of plaintiff's anterior cruciate ligament ("ACL") and a cartilage defect. (Tr. 388). On June 14, 2004, Thomas F. Satterly Jr., D.O., performed left knee arthroscopy and performed ACL reconstruction. (Tr. 390-92).

Plaintiff received post-operative care from Dr. Satterly. On August 13, 2004, Dr. Satterly noted that plaintiff was doing quite well with her therapy; that her range of motion was improving; and she did not report much pain. (Tr. 401).

On September 23, 2004, plaintiff returned to Dr. Satterly

and reported that she was doing well with her knee; however, she reported increasing complaints related to her right shoulder. (Tr. 405). Upon examination, plaintiff had difficulty with range of motion, and had positive impingement signs. (Id.) Dr. Satterly opined that plaintiff should proceed with shoulder surgery. (Id.)

On October 21, 2004, Dr. Satterly performed arthroscopic surgery on plaintiff's right shoulder. (Tr. 403-04). She returned on October 29, 2004 for follow up, and it was noted that she had good range of motion and was "doing quite well with her shoulder." (Tr. 405).

Plaintiff returned to Dr. Satterly on December 17, 2004. (Id.) Regarding her knee, Dr. Satterly noted that plaintiff was "doing quite well." (Id.) She ambulated without limp, but stated that she did limp when walking farther. (Id.) She had good strength and stability, and Dr. Satterly recommended that she add endurance and power strength to her physical therapy regimen. (Tr. 405). Regarding her shoulder, Dr. Satterly noted that she was "doing quite well" and had "excellent range of motion with no significant pain." (Id.) Plaintiff complained of pain in her low back, but not as much leg pain as before. (Id.) Dr. Satterly recommended a repeat MRI to determine if there had been any change in position of the involved disc, and speculated that plaintiff may require only therapy. (Id.)

MRI of plaintiff's lumbar spine, performed on January 7, 2005, revealed diffuse disc herniation at L4-5 which was not significantly changed from the previous examination. (Tr. 427).

-8-

In 2005, plaintiff presented to St. John's Clinic (also "St. John's") with complaints of low back pain radiating down her right hip and leg. (Tr. 257).[14] She also complained of right ear pain, an irritated throat, burning in her chest when she coughed, and knee pain. (Id.) Plaintiff was diagnosed with lumbar disc disease, cardiac arrhythmia, and right knee pain. (Tr. 258). She was given Lidoderm patches,[15] Vicodin,[16] and Flexeril.[17] (Id.) Plaintiff returned with complaints of low back pain that radiated down both legs and which interfered with sleep. (Tr. 255). She stated that Flexeril helped, but she did not always take it. (Id.) She was tender across her lumbar spine. (Tr. 256). She was assessed with lumbar disc disease, low back pain, knee pain, and gastroesophageal reflux disease (also "GERD"). (Id.)

She returned to St. John's Clinic in 2005, stating that she planned to go to Lakes County Testing Center for vocational rehabilitation. (Tr. 253). She stated that she was trying to find a job, was "tired of just existing," and wanted to get a good paying job. (Id.) Her back pain was unchanged, and she was noted

---

[14]In some of the St. John's Clinic records, the month and day of the visit is obscured. This summary includes all of the information that is available.

[15]A Lidoderm patch, or topical Lidocaine, is a local anesthetic used to relieve burning, stabbing aches and pains.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603026.html

[16]Vicodin is a combination of the drugs Acetaminophen and Hydrocodone, and is used to relieve moderate to moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html

[17]Flexeril, or Cyclobenzaprine, is a muscle relaxant used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682514.html

to be tender across her lumbar spine.  (Tr. 253-54).

On August 12, 2005, plaintiff was seen at St. John's Clinic with complaints of cold symptoms including a scratchy throat, ear pain, and cough.  (Tr. 225).  No other complaints were noted.  (Id.)  She was diagnosed with sinusitis.  (Tr. 226).  She returned with complaints of a rash, stating that she had recently been swimming.  (Tr. 227).[18]  No other complaints were noted.  (Id.)

On March 13, 2006, a vocational evaluation was performed at the Lakes Country Resource Center by vocational evaluator Tanya Johnson.  (Tr. 156-60).  Plaintiff indicated that she would like to gain employment as a medical billing clerk.  (Tr. 156).  She indicated that she had overuse syndrome of her upper extremities, rotator cuff tendonitis of her right shoulder, tenosynovitis of both wrists and hands, falling arches, and symptoms in her lower back and knees.  (Id.)  Ms. Johnson indicated that plaintiff presented herself in a friendly and cooperative manner and appeared to be self-motivated.  (Id.)

Included in Ms. Johnson's report is a summary of plaintiff's past employment.  (Tr. 158).  Plaintiff stated that she was last employed at a company called "Sew On and On" "for the second time" as a sewing machine operator, a position she held for three years "before the company went out of business."  (Id.)  She was employed at Brown Shoe Company for seven years before she was laid off due to the company closing.  (Id.)  She was employed at

_____

[18]The record indicates that this visit took place in 2005, but the full date is not shown.  See (Tr. 227).

-10-

Sew On and On for approximately eight months "before resigning with a couple days notice." (Id.) Prior to this, she was employed at Ballem Enterprises as a customer service representative and accounting clerk for six months before quitting without notice to relocate. (Tr. 158). She was employed at Osle's Barbeque for two years as a grill cook and waitress before the business closed. (Id.) Plaintiff was also self employed on two occasions. (Id.) On one of these occasions, she owned "Country Kennel" where she raised dogs, and on another occasion she owned "L & L Game Room" for six months "before selling due to the stress level." (Id.)

It was determined that plaintiff's WAIS full-scale IQ equivalency was 93, and that her intellectual functioning and aptitude were in the average range. (Tr. 157, 160). Plaintiff expressed an interest in pursuing further education and gaining employment in the field of medical billing and coding. (Id.) Plaintiff completed three interviews with recruiters from various facilities, and it was noted that plaintiff's job duties would include greeting patients, compiling data for financial reports, completion of billing and insurance forms, and proficient use of a computer. (Id.)

In 2006, plaintiff was seen at St. John's Clinic with complaints of vaginal discharge, pain in her ears and throat, and a runny nose. (Tr. 251). She stated that she was sleeping better with Rozerem. (Id.) Plaintiff was assessed with sinus congestion and suspected bacterial vaginosis. (Tr. 252).

Plaintiff returned to St. John's Clinic in 2006 with

-11-

complaints of a headache, sore throat, runny nose, ear pain, an increase in drainage in her throat, nasal drainage, and an occasional cough. (Tr. 249). She had no other complaints. See (Tr. 249-50).

On April 8, 2006, plaintiff was seen at St. John's Clinic with complaints of a little pain above her pubic bone, and heavy menstruation. (Tr. 247). It was noted that she had no complaints of abdominal pain or rectal bleeding. (Id.) She complained of daily back pain for which she took Hydrocodone. (Id.)

On April 28, 2006, plaintiff was seen at St. John's Clinic with complaints of nausea and vomiting, an increase in sinus drainage, some cough, and back and knee pain. (Tr. 245).

On June 29, 2006, plaintiff was seen at St. John's Clinic with complaints of heavy menstrual bleeding and cramping. (Tr. 243). It was indicated that she would soon begin classes for medical office technology. (Id.) She stated that she had been unable to get out of the house very much in the last three to four days. (Id.)

Plaintiff returned to St. John's Clinic on July 7, 2006 for a well woman examination, and complained of heavy menstrual bleeding. (Tr. 241).

On July 25, 2006, plaintiff was seen by Michael O. Growney, M.D., with complaints of heavy and irregular menstrual bleeding. (Tr. 233-34). She indicated that she smoked one and one-half packs of cigarettes per day. (Tr. 234). An endometrial biopsy was performed and revealed benign results. (Tr. 232-33).

-12-

Provera[19] was prescribed.  (Tr. 233).

Plaintiff returned to St. John's Clinic on October 2, 2006 with complaints of a sore throat and ear pain. (Tr. 239).  It was noted that her back pain was the same, she was tender across her lumbosacral spine, she had epigastric tenderness, and had a low grade fever and some heartburn.  (Tr. 239-40).  Her gait was described as "coordinated and smooth."  (Tr. 240).  She was assessed with left ear pain, GERD, allergies, and lumbar disc disease.  (Tr. 240).  She was given allergy medication, an antibiotic, and Vicodin.  (Id.)

She was seen again on October 17, 2006 with complaints of a sore throat, cough and muscle spasms in her back, (Tr. 339-40), and on January 15, 2007 for a check up, at which time she complained of fullness in her ears, watery diarrhea, and bilateral knee pain.  (Tr. 337).  She was tender across her lumbar spine. (Tr. 338).

Plaintiff returned to St. John's on January 24, 2007 with complaints of nasal congestion, cough, sore throat, headache, nasal drainage, and pain and burning in her eyes.  (Tr. 335).   On February 27, 2007, she presented with complaints of headache, sinus pressure and dizziness.  (Tr. 333-34).

On February 28, 2007, plaintiff was seen at the Phelps County Regional Medical Center by Chun Ho So, M.D., for complaints

---

[19]Provera, or Medroxyprogesterone, is used to treat abnormal menstruation or irregular bleeding.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682470.html

of constipation and rectal pain.  (Tr. 292).  She noted a history
of rapid heart rate and thickened left ventricle, GERD, hernia,
degenerative disc disease, scoliosis, bone spurs in her back,
anxiety and depression.  (Id.)  It was noted that she had smoked
one pack of cigarettes per day for 22 years, and had smoked one and
one-half packs of cigarettes per day for the past two years.  (Id.)
Physical examination was normal.  (Tr. 293).  A colonoscopy was
performed on that same date and revealed grade 3 internal
hemorrhoids for which suppositories were given.  (Tr. 294-95).

On March 2, 2007, plaintiff presented to the emergency
room at Phelps County Regional Medical Center with complaints of
sharp pain in her abdomen, and black/bloody stools.  (Tr. 277).
Physical examination was largely normal.  (Tr. 278).  It was noted
that her behavior was appropriate, her mood and affect were normal,
and that she had neither suicidal nor homicidal ideation.  (Tr.
285).  She denied that she was having problems with anxiety or
depression.  (Tr. 286).  Under "Past Medical History," plaintiff
stated that she had bronchitis, cardiac symptoms, a plate and screw
in her left knee, excessive menstrual bleeding, bone spurs in her
back that were pressing on her sciatic nerve and causing leg
numbness, and pain in her right hip.  (Id.)  Plaintiff underwent an
abdominal CT scan, which revealed a small amount of free fluid in
the pelvis, and apparent cysts on the surface of the cervix.  (Tr.
279).

On March 14, 2007, plaintiff presented to St. John's
Clinic for a checkup, stating that she had pain with standing and

-14-

walking due to a bunion on her right foot.  (Tr. 331).

On March 27, 2007, plaintiff saw Dr. Sullivan with complaints of a bunion on her right foot that caused pain with activity.  (Tr. 300).  She reported hypertension, gastric reflux, and hiatal hernia, but gave no other medical history.  (Id.) Radiographic examination of plaintiff's right foot performed on March 27, 2007 revealed a right foot bunion.  (Tr. 308).

Plaintiff returned to St. John's Clinic on April 3, 2007, with complaints of a sore throat and left ear pain.  (Tr. 329).  On April 13, 2007, she complained of bilateral foot pain, (Tr. 327), and on April 23, 2007, she complained of lower abdominal cramping and watery stools.  (Tr. 325).

On April 24, 2007, plaintiff saw Dr. Sullivan with complaints of bilateral foot pain.  (Tr. 299).  Dr. Sullivan recommended that plaintiff undergo a nerve block, but plaintiff did not wish to proceed.  (Id.)

On May 14, 2007, plaintiff was seen at St. John's Clinic with complaints of a skin rash and sore throat.  (Tr. 323-24).  She was diagnosed with allergic contact dermatitis, and was given allergy medication and advised to use an oatmeal bath.  (Tr. 324).

On May 15, 2007, plaintiff returned to St. John's Clinic and was seen by Bashar Mohsen, M.D.  (Tr. 297).  Plaintiff's chief complaints were numbness and pain on the bottoms of her feet. (Id.)  Plaintiff also complained of back pain shooting to both of her lower extremities, difficulty walking, numbness in her right upper extremity, neck pain, muscle pain, joint pain and skin rash.

-15-

(Id.)  She denied complaints of depression and anxiety, and denied memory problems.  (Id.)

Upon physical examination, Dr. Mohsen noted that plaintiff was in no acute distress, and that "[t]here was no pain during the interview." (Tr. 297).  Plaintiff's motor strength was 5/5 in her upper extremities and 4/5 in her lower extremities, and she had some decrease in sensation in her right upper and right lower extremities.  (Id.)  She had good pulses and no edema; her gait was steady; and her coordination was normal.  (Id.)  Dr. Mohsen's impression was bilateral tarsal tunnel syndrome, right lumbar radiculopathy, and right carpal tunnel syndrome, and EMG studies were ordered.  (Id.)

EMG nerve conduction study performed at St. John's on May 18, 2007 revealed right tarsal tunnel syndrome.  (Tr. 302).  It was noted that the study showed "no evidence of myopathy, polyneuropathy, lumbar radiculopathy." (Id.)

On May 22, 2007, plaintiff was seen at St. John's with complaints of occasional left sided chest pain, and stated that she presently had back pain.  (Tr. 321).  Upon examination, she was noted to be well developed, cardiovascular examination was normal, plaintiff's memory was noted to be intact, and psychological examination revealed normal findings.  (Tr. 322).  On May 24, 2007, plaintiff underwent a treadmill stress test at Phelps County Regional Medical Center which revealed no evidence of stress-induced ischemia.  (Tr. 275-76).

On May 29, 2007, plaintiff saw Dr. Sullivan for

-16-

consultation regarding surgery to remove a bunion on her left foot. (Tr. 351).

On June 28, 2007, plaintiff was seen by Timothy Martin, M.D., a cardiovascular specialist, for preoperative clearance prior to foot surgery by Dr. Sullivan. (Tr. 262). Dr. Martin wrote that plaintiff denied "any muscle aches, joint tenderness, joint pain, or swelling." (Tr. 263). He noted that she had been treated effectively with Atenolol for heart palpitations and fast heartbeat. (Tr. 262). He noted that plaintiff had last been seen in November of 2005, and that, "[a]pparently, since her last visit, she has done well." (Id.) Dr. Martin noted that plaintiff was a smoker who had quit, but had later re-started. (Id.) Plaintiff denied neck pain, chest pain, shortness of breath, and gastro-intestinal symptoms. (Tr. 262-63). Dr. Martin noted that physical examination was normal; that plaintiff was well-developed and nourished with full range of motion of her neck; that her cardiovascular and pulmonary examinations were normal; and that there were no findings in plaintiff's extremities. (Id.) He noted that plaintiff had a history of gastritis which had resolved, and that she was being followed for reflux disease. (Id.) Dr. Martin opined that plaintiff was a good risk for foot surgery. (Id.)

On July 3, 2007, plaintiff saw Michael Growney, M.D. with complaints of heavy menstrual bleeding and intolerance to Provera. (Tr. 269-70). Past medical history was noted as anxiety, allergies, and a thickened left ventricle. (Tr. 269). On July 9, 2007, Dr. Growney performed endometrial ablation (removal of the

-17-

lining of the uterus to treat heavy menstrual bleeding) at Phelps County Regional Medical Center.  (Tr. 271-72).

On July 6, 2007, plaintiff was seen by Michael Sullivan, DPM, at Phelps County Regional Medical Center with complaints of right foot pain.  (Tr. 265-66).  She complained of GERD and irritable bowel syndrome and diffuse joint pain, but had no other musculoskeletal complaints.  (Id.)  Dr. Sullivan diagnosed plaintiff as having a bunion on her right foot.  (Id.)  On July 13, 2007, Dr. Sullivan performed a bunionectomy on plaintiff's right foot at Phelps County Regional Medical Center.  (Tr. 267-68).  She followed up with Dr. Sullivan on July 17, 2007, (Tr. 350), and x-ray revealed that her right foot was in stable condition.  (Tr. 355).

On July 19, 2007, plaintiff was seen at St. John's Clinic by neurologist Bashar Mohsen, M.D., with complaints of back pain and lower extremity weakness.  (Tr. 296).  Dr. Mohsen noted that a 2004 lumbar spine MRI showed degenerative changes at L5-S1.  (Id.)  Upon examination, she demonstrated some decrease in her lower extremity reflexes and strength, and had 5/5 strength in her upper extremities and 4/5 in her lower extremities.  (Id.)  She was given Neurontin[20] and Zanaflex;[21] and Hydrocodone was stopped and replaced with Vicodin.  (Id.)  X-ray of plaintiff's lumbar spine performed

---

[20]Neurontin, also known as Gabapentin, is used to help control certain types of seizures in patients who have epilepsy. It is also used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles). http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html

[21]Zanaflex, or Tizanidine, is used to relieve muscle spasm and tightness.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601121.html

on this date revealed disc space narrowing at L4-L5 with associated facet joint arthropathy. (Tr. 343). These findings were considered to be "moderate/severe." (Id.)

On August 8, 2007, plaintiff was seen at St. John's Clinic and reported crying and feeling depressed and feeling that life was not worth living. (Tr. 309). Plaintiff stated that she did not like to take antidepressants. (Id.) She also complained of a cough and a yeast infection, and stated that her foot slipped while she was descending steps and she felt her left knee "go out" on her. (Id.) Upon examination, her left knee was tender to palpation. (Tr. 310). Psychological examination was negative. (Id.) She was referred to Pathways for evaluation of depression and to Dr. Marti for orthopedic evaluation. (Tr. 310).

In an August 9, 2007 disability report, interviewer E. Reese noted that, during her interview, plaintiff was observed to either stand or sit for ten minutes at a time, and that she stretched out, got up, stated she was tired, and leaned across the desk. (Tr. 163). It is indicated that plaintiff had a hard time walking because she had undergone surgery to remove a bunion, and had a dressing on her foot. (Id.) Plaintiff stated she was unable to work due to irritable bowel syndrome, anxiety attacks, bulged and degenerating discs at L4 and L5, scoliosis, tarsal tunnel, possible plantar fasciitis, arthritis in the lower back, hiatal hernia, "worn out knee caps," and thickened left ventricle. (Tr. 166). Plaintiff listed numerous severe complaints related to these conditions. (Id.) She stated that these conditions first

-19-

interfered with her ability to work, and that she became unable to work because of them, on July 28, 2004.  (Id.)  She stated that she had not worked at any time after the date her conditions first interfered with her ability to work.  (Id.)

On August 17, 2007, plaintiff was seen by Dr. Sullivan for post-operative follow-up regarding her right foot bunionectomy, and was noted to be progressing well.  (Tr. 349).

On August 27, 2007, plaintiff sought outpatient mental health services through Pathways CBH.Inc. ("Pathways"), at which time she complained of depression, anxiety, panic, and pain.  (Tr. 461-62).   Plaintiff's clinician, Phillip Smith, wrote that plaintiff's depression was "severe," and that her anxiety and panic were "mild."  (Tr. 462).  Plaintiff reported that she was a victim of domestic abuse, stating "[w]hen my ex-husband wouldn't leave me alone, he threatened to kill me."  (Id.)  Plaintiff reported that she wanted to "get her life back."  (Tr. 467).  Mr. Smith wrote that "the negative aspects of [plaintiff's] past relationship are still impacting her today (per her report)."  (Tr. 466). Plaintiff's diagnoses included depression and post-traumatic stress disorder, and her Global Assessment of Functioning was estimated at 56, signifying moderate difficulties in social, occupational, or school functioning.  (Tr. 465-66).  On October 29, 2007, plaintiff returned to Pathways and was seen by Lucretia Whited, MA.  (Tr. 471).  Ms. Whited noted that plaintiff had a helpless/hopeless attitude, and was irritable, angry and hostile.  (Tr. 472).  Ms. Whited noted that plaintiff had a depressed affect, a dysphoric

-20-

mood, trouble falling asleep, and decreased energy, but examination was otherwise within normal limits. (Id.) The record indicates that plaintiff received outpatient treatment consisting of medication and counseling services. (Tr. 459-75).

On November 8, 2007, an MRI of plaintiff's lumbar spine revealed relatively severe loss of disc height at L4-5 and moderate degenerative changes in the facet joints. (Tr. 431).

On December 17, 2007, Medical Consultant Kim W. Miller completed a Physical Residual Functional Capacity Assessment form. (Tr. 362-67). Ms. Miller opined that plaintiff could occasionally lift 20 pounds and frequently lift ten; could sit, stand and/or walk for six out of eight hours; and could push and pull without limitation. (Tr. 363). She opined that plaintiff could only occasionally climb, but assessed no other postural limitations, and assessed no manipulative or other limitations. (Tr. 363-67).

Plaintiff saw Dr. Mohsen on January 23, 2008 for follow-up, and complained of neck pain and upper extremity problems. (Tr. 456). She was able to move all of her extremities without significant limitation. (Id.) Cervical spine x-ray revealed disc space narrowing at C5-6. (Tr. 433). January 28, 2008 bone scan revealed abnormal findings relative to plaintiff's right great toe and left knee. (Tr. 457).

On December 4, 2008, plaintiff underwent an MRI of her left knee, and it was noted that she had a small medial meniscal tear. (Tr. 406).

On March 11, 2009, plaintiff was seen by Keith J.

-21-

Frederick, D.O. for evaluation of her knees, primarily her left.
(Tr. 407-08).  Plaintiff complained of pain and instability in her
left knee, and stated that knee symptoms caused difficulty in
walking long distances and climbing stairs.  (Tr. 407).  Plaintiff
also complained of pain in her lumbar and cervical spine.  (Id.)
Dr. Frederick noted that plaintiff reported walking "a mile or two
at a time" around her two-acre place, and that plaintiff "was
trying to stay fit and stay active" but was "still having a lot of
trouble with her knee."  (Id.)  Physical examination revealed
tenderness about the left knee, and x-ray revealed mild narrowing
of the medial joint space of the left knee.  (Id.)  Dr. Frederick
opined that simple conservative treatment would be insufficient,
and that knee replacement would be too aggressive, given that "x-
rays that do not show bone on bone loss at this point."  (Tr. 408).
Dr. Frederick recommended arthroscopic surgery to address the
meniscal tear.  (Id.)

On April 13, 2009, Dr. Frederick performed arthroscopic
surgery of plaintiff's left knee.  (Tr. 411).  Plaintiff saw Dr.
Frederick on June 24, 2009 for follow up, and was tender about the
medial joint of her left knee.  (Tr. 413).  X-ray revealed
moderately severe osteoarthritis.  (Id.)  Dr. Frederick noted that
knee replacement was not a desirable course of action.  (Id.)

On November 29, 2009, plaintiff saw Dr. Sullivan for
complaints referable to her right foot that were consistent with
tarsal tunnel syndrome.  (Tr. 378).  Dr. Sullivan noted that
plaintiff had been scheduled for surgery in the past but had

-22-

canceled due to family reasons, and that he would schedule surgery at plaintiff's discretion.  (Id.)  Surgery was ultimately performed on February 5, 2010, and on February 9, 2010, plaintiff returned to Dr. Sullivan for post-operative follow-up, and it was noted that plaintiff was doing well and had adequate pain control.  (Tr. 374).

On March 5, 2010, plaintiff saw Larry B. Marti, M.D. with complaints of mild and moderate left knee pain.  (Tr. 414).  Dr. Marti noted that plaintiff was alert and oriented and was not anxious or agitated.  (Tr. 415).  Her sensation and deep tendon reflexes were intact, and she was able to straight-leg raise. (Id.)  Dr. Marti opined that plaintiff undergo injection therapy. (Id.)  March 26, 2010 x-ray of plaintiff's lumbar spine revealed facet joint arthropathy and disc space narrowing at L4-5.  (Tr. 434).   X-ray of plaintiff's cervical spine revealed disc space narrowing at C5-6 and C6-7, and mild intervertebral foraminal encroachment at C5.  (Tr. 435).  Plaintiff returned to Dr. Marti on April 5, 2010, and underwent injections in her knees.  (Tr. 417). Plaintiff returned to Dr. Marti on April 12, 2010, and stated that her left knee felt better, but her right knee was painful.  (Tr. 418).  Dr. Marti noted that plaintiff was alert and oriented, and was not anxious or agitated.  (Id.)  Plaintiff underwent a second set of injections.  (Tr. 418-19).

X-ray of plaintiff's lumbar spine performed on March 26, 2010 revealed facet joint arthropathy at L4 and L5 and disc space narrowing at L4-5.  (Tr. 434).

The record includes an April 21, 2010 opinion letter from

-23-

Mary Jane Mason, M.D., of St. John's Clinic.  (Tr. 478).  Dr. Mason
wrote that plaintiff had suffered from "heart rhythm problems"
since 2002 and "many orthopedic problems" since 2003.  (Id.)  Dr.
Mason wrote that, "as far back as 2002" it was impossible for
plaintiff to perform physical work, and her anxiety precluded even
sedentary work involving contact with the public.  (Id.)  Dr. Mason
wrote that plaintiff's knee pain could be treated surgically, but
her back pain, which had not been demonstrated to be due to a
problem lending itself to surgical intervention, could not.  (Id.)
Dr. Mason wrote "[i]t has long been my feeling that Mrs. Brown is
most disabled by her deep depression and anxiety, and I continue to
recommend that she seek out and remain under the care of a
psychiatrist.   I do not believe she is now or will ever be
employable.  I feel she has been disabled since 2003."  (Tr. 478).


### III.   The ALJ's Decision

     The ALJ determined that plaintiff had not engaged in
substantial gainful activity since August 1, 2007, the date she
filed her application.   (Tr. 13).   The ALJ determined that
plaintiff had the severe impairments of degenerative disc disease,
status post right bunionectomy; status post right tarsal tunnel and
plantar fascial release; and status post left knee arthroscopic
surgery, times two.  (Id.)  The ALJ determined that plaintiff's
medically determinable impairments of depression and anxiety,
considered singly and in combination, did not cause more than
minimal limitation in plaintiff's ability to perform basic work

-24-

activities and were therefore non-severe. (Id.) The ALJ concluded that plaintiff did not have an impairment, or combination of impairments, of listing-level severity. (Tr. 14).

        The ALJ analyzed all of the medical and other evidence of record and concluded that plaintiff had the residual functional capacity (also "RFC") to perform light work as defined in 20 C.F.R. § 416.967(b) except she could occasionally climb ramps and stairs but could not climb ladders, ropes or scaffolds. (Id.) Citing 20 C.F.R. § 416.929 and Social Security Rulings 96-4p and 96-7p, the ALJ determined that, although plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, her statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with her RFC. (Tr. 14-17).

        The ALJ determined that plaintiff was able to perform her past relevant work as a heel finisher and an accounts receivable clerk, work which did not require the performance of work-related activities precluded by her RFC. (Tr. 19). The ALJ concluded that plaintiff had not been under a disability, as defined in the Act, since August 1, 2007, the date her application was filed.

## IV.   Discussion

        To be eligible for benefits under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992). The

Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace.   See 42 U.S.C. § 423(d)(1)(A) (defining "disability" for DIB purposes).   The Act provides disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   Id.   It further specifies that a person must be both unable to do her previous work and unable, "considering [her] age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work."   42 U.S.C. §§ 423(d)(2)(A); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process.   See 20 C.F.R. §§ 404.1520, 416.920; Bowen, 482 U.S. at 140-42.   The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied.   Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities.   If

-26-

the claimant's impairment is not severe, then she is not disabled. If the claimant's impairment is severe, the Commissioner then determines whether it meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment is equivalent to one of the listed impairments, she is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform her past relevant work.  If so, the claimant is not disabled.  If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. Pearsall, 274 F.3d at 1217, Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir.  2000).  Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Substantial evidence is less than a preponderance but enough that a reasonable person would find  adequate to support the conclusion.  Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998).  To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ;

-27-

2.    The plaintiff's vocational factors;

3.    The medical evidence from treating and consulting physicians;

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.    Any corroboration by third parties of the plaintiff's impairments;

6.    The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may also support a different outcome. Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003) (citing Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)).

In the case at bar, plaintiff contends that the ALJ's decision is not supported by substantial evidence on the record as a whole because the ALJ erroneously determined that her mental impairments were not severe; because the ALJ failed to find that she had an impairment or combination of impairments of listing-level severity; because the ALJ failed to properly evaluate her

-28-

credibility; and because the ALJ failed to give controlling weight to Dr. Mason's opinion.   In response, the Commissioner contends that substantial evidence supports the ALJ's decision.

     A.   <u>Credibility Determination</u>

       The undersigned will first address plaintiff's argument that the ALJ did not properly evaluate her credibility.   Plaintiff asserts that the ALJ improperly evaluated her credibility, specifically challenging the ALJ's observation that her complaints of pain were not fully supported by the medical evidence.   Review of the ALJ's decision reveals no error.

       The Eighth Circuit has "long required an ALJ to consider the following factors when evaluating a claimant's credibility: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. <u>Buckner v. Astrue</u>, 646 F.3d 549, 558 (8th Cir. 2011) (citing <u>Moore v. Astrue</u>, 572 F.3d 520, 524 (8th Cir. 2009); <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008); <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)).   An ALJ is not required to "explicitly discuss each Polaski factor." <u>Goff</u>, 421 F.3d at 791.   "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the

-29-

evidence as a whole.' <u>Buckner</u>, 646 F.3d at 558 (quoting <u>Goff</u>, 421 F.3d at 792).

The "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working. <u>Gregg v. Barnhart</u>, 354 F.3d 710, 713-14 (8th Cir. 2003). The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject. <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005). When an ALJ explicitly considers the <u>Polaski</u> factors and discredits a claimant's complaints for a good reason, that decision should be upheld. <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001); <u>see also</u> <u>Wildman v. Astrue</u>, 596 F.3d 959, 968 (8th Cir. 2010) (the court must defer to the ALJ's credibility finding if the ALJ "explicitly discredits a claimant's testimony and gives a good reason for doing so.")

Here, the ALJ determined that, while plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of those symptoms were not fully credible. The ALJ noted that "the issue is not the existence of pain, but rather the degree of incapacity incurred because of it." (Tr. 17). Although the ALJ did not specifically cite <u>Polaski</u>, he wrote that he had considered all of plaintiff's symptoms in accordance with 20 C.F.R. § 416.929 and Social Security Rulings 96-4p and 96-7p, which correspond with <u>Polaski</u> and

-30-

credibility determination.   The ALJ then noted numerous inconsistencies in the record detracting from plaintiff's credibility.

The ALJ noted that, while plaintiff had a long-standing history of back pain, she had received only conservative treatment. Similarly, despite plaintiff's allegations of disabling psychological symptoms, she did not seek mental health treatment until August of 2007, and even then there was no recommendation that she required hospitalization or any other treatment beyond outpatient counseling and medication.  Claims of disabling symptoms may be discredited when the record reflects minimal or conservative treatment.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); see also Onstead v. Sullivan, 962 F.2d 803, 805 (8th Cir. 1992); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (the claimant's failure to seek medical assistance for her alleged physical and mental impairments contradicted her subjective complaints of disabling conditions).  Despite plaintiff's arguments to the contrary, it was proper for the ALJ to consider this evidence.  Plaintiff has presented no evidence that financial hardship precluded her from seeking mental health treatment at an earlier time, and the record does not support the conclusion that plaintiff was ever refused medical treatment or went without needed medication due to a lack of medical insurance or to an inability to pay for medical treatment.  As the Eighth Circuit has noted, while evidence of financial hardship may justify a claimant's failure to obtain treatment or take prescription medication, it is not an

-31-

automatic excuse.  Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992) (citing Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984)); Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989); Brown v. Heckler, 767 F.2d 451, 453 n. 2 (8th Cir. 1985).

The ALJ also noted that the objective medical evidence failed to support plaintiff's claims of total disability.  While the lack of objective medical evidence to support the degree of alleged limitations does not alone support an adverse credibility determination, an ALJ is entitled to consider the fact that the plaintiff's allegations are not fully supported by the medical evidence in the record.  Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008).  The ALJ noted that, despite plaintiff's allegations of disabling pain in her legs and feet preventing her from walking even short distances, plaintiff's medical treatment providers consistently described her gait as normal, smooth, steady and coordinated.  Dr. Mohsen specifically wrote that plaintiff's coordination and reflexes were normal, her motor strength was 5/5 in her upper extremities and 4/5 in her lower extremities.  Dr. Mohsen also noted that plaintiff was not in pain during his interview of her.  When plaintiff saw Dr. Martin in June of 2007, she denied any muscle aches, joint tenderness, joint pain, or swelling, and Dr. Martin noted that the results of his physical examination of plaintiff were normal.  In July of 2007, examination revealed 5/5 motor strength in plaintiff's upper extremities and 4/5 strength in her lower extremities.  In July of 2008, plaintiff's gait was steady and she was able to move all of her

extremities without significant limitation, and she demonstrated normal coordination and strength.  In 2010, her sensation and deep tendon reflexes were intact.  When she was seen at St. John's on May 22, 2007, her memory was noted to be intact, and psychological examination revealed normal findings.  As indicated above, the St. John's records also consistently noted normal mental status examinations, and reflected no referral for mental health treatment until August of 2007.  The ALJ properly considered the lack of objective medical evidence to support plaintiff's allegations. Juszczyk, 542 F.3d at 632 (deferring to the ALJ's credibility determination where the objective medical evidence did not support the claimant's testimony as to the depth and severity of his impairments).

The ALJ also noted Dr. Martin's observation that plaintiff's tachycardia with anxiety and atypical chest pain were effectively treated with medication.  In 2005 she reported that Flexeril helped her back, and when she was seen in August of 2007, she was noted to be progressing and that she could soon resume wearing a regular shoe.  Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").  Furthermore, as the ALJ noted, while plaintiff would have understandably had a period of incapacity following each of her surgeries, the evidence is insufficient to establish that she was disabled for twelve consecutive months or longer after each procedure, a requirement for a finding of disability.  20 C.F.R. §§ 404.1505, 416.905.

-33-

In 2005, plaintiff stated that Flexeril helped her back pain, but that she did not always take it.  Similarly, when she was seen at St. John's in August of 2007, she reported severe psychological symptoms, but stated that she did not like to take antidepressants.  Plaintiff's unwillingness to take medication that could alleviate her symptoms is inconsistent with her complaints of disabling conditions.  Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).

As the ALJ noted, when plaintiff was seen by Dr. Martin in June of 2007, she denied that she had any muscle aches, joint tenderness, joint pain, or swelling.  When she was seen at Phelps County Regional Medical Center in March of 2007, she stated that she was not currently having problems with depression or anxiety, and her mood and affect were found to be normal upon examination.  When plaintiff saw Dr. Mohsen on May 15, 2007, she denied depression, anxiety, or memory loss.  When she saw Dr. Sullivan in July of 2007, she complained of diffuse joint pain, but denied other musculoskeletal complaints.  The fact that plaintiff did not consistently complain of the conditions she now claims are disabling detracts from her credibility.  See Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting later allegations of back pain when no complaints made about such pain while receiving other treatment).

The ALJ noted that the evidence does not support plaintiff's contention that she required bilateral knee replacements, noting Dr. Marti's observation that plaintiff would

-34-

have to try injection therapy before knee replacement surgery could
even be considered.   The ALJ also noted that, despite plaintiff's
claim that she suffered from dementia, the record contained no
evidence of this condition; in fact, as noted above, plaintiff's
memory was repeatedly noted to be normal.   In addition, during her
administrative hearing, plaintiff indicated that she had extreme
difficulty walking even to and from the bathroom.   However, in
2009, as the ALJ noted, plaintiff reported that she had been
walking "a mile or two at a time."   (Tr. 407).   Finally, while
plaintiff testified that she had to sit on her side and had to
alternate sitting and standing, she did not describe such
complaints to her medical treatment providers.   See Jones v.
Callahan, 122 F.3d 1148, 1152 (8th Cir. 1997) (noting that ALJ may
consider evidence that a claimant has exaggerated his or her
symptoms when evaluating claimant's subjective complaints).

        Also notable is plaintiff's vocational evaluation with
Ms. Johnson, who noted that plaintiff presented herself in a
friendly and cooperative manner, and appeared to be self-motivated.
Ms. Johnson also included an extensive summary of plaintiff's past
employment, as explained, supra.   It is notable that, for the most
part, plaintiff left her former jobs because she was laid off,
because the business closed, or because she wished to relocate, and
not due to the conditions she now alleges render her totally
disabled.   While plaintiff complains that the ALJ erroneously
considered this evidence, the undersigned determines that the ALJ
was entitled to consider this evidence as detracting from

-35-

plaintiff's subjective allegations.  See Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 2004) (citing Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992) (finding that a cessation of work for reasons unrelated to medical condition militated against a finding of disability)).

Plaintiff also complains that the ALJ erroneously considered her ability to perform some daily activities such as cooking, caring for herself, watching television and reading to her brother's children as detracting from her credibility.  Review of the decision reveals no error.  As noted above, consistency between a claimant's activities of daily living and her subjective complaints is part of the well-established credibility analysis. Polaski, 739 F.2d at 1322.  The ALJ in this case did not rely exclusively upon plaintiff's activities of daily living to discredit her subjective complaints; rather, that consideration was but one of several inconsistencies the ALJ noted from the record that detracted from plaintiff's subjective complaints.

Review of the record supports the ALJ's conclusion that there were inconsistencies in the record as a whole that detracted from the credibility of plaintiff's subjective complaints.  While plaintiff contends that the ALJ failed to take into account favorable evidence regarding her credibility, it cannot be said that the ALJ's credibility determination was unsupported in light of the evidence in the record as a whole.  See Juszczyk, 542 F.3d at 632 (deferring to the ALJ's credibility determination where the objective medical evidence did not support the claimant's testimony

-36-

as to the depth and severity of his physical impairments).
Accordingly, the undersigned concludes that substantial evidence
supports the ALJ's credibility determination.

      B.   <u>Dr. Mason's Opinion Evidence</u>

      Plaintiff also contends that the ALJ erred when he gave
less than controlling weight to Dr. Mason's opinion.  Review of the
decision reveals no error.

      As noted in the above summary of the medical information
of record, Dr. Mason wrote that plaintiff had suffered from "heart
rhythm problems" since 2002 and "many orthopedic problems" since
2003, and that, "as far back as 2002," plaintiff could not perform
physical work and could not, due to anxiety, perform even sedentary
work involving contact with the public due to anxiety.  (Tr. 478).
Dr. Mason wrote that "[i]t has long been my feeling that Mrs. Brown
is most disabled by her deep depression and anxiety, and I continue
to recommend that she seek out and remain under the care of a
psychiatrist.  I do not believe she is now or will ever be
employable.  I feel she has been disabled since 2003."  (<u>Id.</u>)

      The Regulations require that more weight be given to the
opinions of treating physicians than to other sources.  20 C.F.R.
§§ 404.1527(d)(2), 416.927(d)(2).  A treating physician's opinion
as to the nature and severity of a claimant's impairments should be
given controlling weight if that opinion is well supported by
medically acceptable clinical and laboratory diagnostic techniques,
and is not inconsistent with other substantial evidence in the
record.  <u>Id.</u>

-37-

Opinions of treating physicians do not automatically control, however, because the ALJ must evaluate the record as a whole.  Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004). When an ALJ does not give a treating physician's opinion controlling weight, he must look to various factors in determining what weight to give it.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  These factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for her findings, whether other evidence in the record is consistent with her findings, and her area of specialty.  Id.  Greater weight will be given to a treating source who has seen the claimant "a number of times and long enough to obtain a longitudinal picture" of the claimant's impairment.  20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i).  This rule is premised, at least in part, on the concept that a physician with a longstanding treatment relationship with the claimant is more familiar with a claimant's condition than are other physicians. Thomas v. Sullivan, 928 F.2d 255, 259 n. 3 (8th Cir. 1991).  The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

In the case at bar, while plaintiff characterizes Dr. Mason as a treating source, there is some question as to whether this characterization is appropriate.  The Regulations define a

-38-

"treating source" as an acceptable medical source

> who provides you, or has provided you, with
> medical treatment or evaluation and who has,
> or has had, an ongoing treatment relationship
> with you.   Generally, we will consider that
> you have an ongoing treatment relationship
> with an acceptable medical source <u>when the
> medical evidence establishes</u> that you see, or
> have seen, the source with a frequency
> consistent with accepted medical practice for
> the type of treatment and/or evaluation
> required for your medical condition(s). . . .
> We will not consider an acceptable medical
> source to be your treating source if your
> relationship with the source is not based on
> your medical need for treatment or evaluation,
> but solely on your need to obtain a report in
> support of your claim for disability.
>
> 20 C.F.R. §§ 404.1502, 416.902 (emphasis added).

Dr. Mason is affiliated with St. John's Clinic, where plaintiff presented for medical treatment on many occasions. However, during her administrative hearing, plaintiff testified that she was not actually seen by Dr. Mason when she presented to St. John's Clinic, and was instead seen by other treatment providers.  Despite this evidence, the ALJ, in an apparent effort to give plaintiff the benefit of the doubt, did not reject plaintiff's attorney's characterization of Dr. Mason as a treating source.  However, regardless of whether Dr. Mason can be characterized as a treating source, the undersigned determines that substantial evidence supports the ALJ's decision to give her opinion less than controlling weight.

First, Dr. Mason's opinion that plaintiff could not perform physical work, could not perform sedentary work involving contact with the public, that she was disabled, and that she was

not nor would ever be "employable" are not the types of medical opinions that are entitled to deference because they involve issues specifically reserved for the Commissioner.   20 C.F.R. §§ 404.1527(e), 416.927(e); Robson v. Astrue, 526 F.3d 389, 393 (8th Cir. 2008) (citing House v. Astrue, 500 F.3d 741, 744 (8th  Cir. 2007)); see also Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is "disabled" or "unable to work," however, involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight"); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("Treating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner.")

Furthermore, the ALJ noted that Dr. Mason's opinion was not supported by the medical evidence as required by Social Security Ruling 96-2p.   Dr. Mason opined that plaintiff was primarily disabled due to depression and anxiety.   As can be seen in the above summary of the medical information of record, plaintiff regularly sought treatment at St. John's for a variety of complaints.   Even so, and even assuming that plaintiff did see Dr. Mason with the frequency required for her opinion to be entitled to controlling weight, the St. John's records fail to document that plaintiff regularly complained of depression, anxiety, or fatigue. Also, despite Dr. Mason's opinion that plaintiff suffered from

debilitating psychological symptoms since 2003, there is no indication in the St. John's records that Dr. Mason, or anyone at St. John's, referred plaintiff for mental health treatment until August of 2007.   The St. John's treatment records are simply inconsistent with Dr. Mason's opinion of total disability, especially her opinion that plaintiff's anxiety precluded her from working with the public and that she was "most disabled by her deep depression and anxiety." (Tr. 478).   When a treating physician's opinion is inconsistent with her own treatment notes, an ALJ may permissibly discount that physician's opinion. <u>Davidson v. Astrue</u>, 578 F.3d 838, 842 (8th Cir. 2009).

        The ALJ also observed that Dr. Mason's opinion was inconsistent with other evidence in the record.   When plaintiff saw Dr. Mohsen in May of 2007, she denied that she experienced depression or anxiety, and when plaintiff was seen at Phelps County Regional Medical Center in March of 2007, she stated that she was not currently having problems with depression or anxiety, and her mood and affect were found to be normal upon examination. Following plaintiff's evaluation at Pathways, there was no recommendation that plaintiff be hospitalized, nor was it indicated that plaintiff was as limited as Dr. Mason suggested.   Dr. Mason's opinion is also inconsistent with the findings of Ms. Johnson who, in 2006, described plaintiff as friendly, cooperative, and self-motivated, and who noted that plaintiff expressed her desire to gain employment as a medical billing clerk and was capable of performing the job duties involved.   Inconsistency with other

-41-

evidence of record is a sufficient reason to discount a treating physician's opinion. <u>Davidson v. Astrue</u>, 501 F.3d 987, 991 (8th Cir. 2007) (citing <u>Goff</u>, 421 F.3d at 790-791).

Finally, the ALJ in this case did not ignore Dr. Mason's opinion; rather, he stated that he gave it some weight, and gave good reasons for his decision to give it less than controlling weight.  Having considered plaintiff's arguments in light of the evidence in the record as a whole, the undersigned concludes that the ALJ considered Dr. Mason's opinion and gave good reasons for his decision to give it less than controlling weight.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

C.   <u>Severity of Mental Impairments</u>

Plaintiff contends that the ALJ's finding that her mental impairments - specifically depression, anxiety, and post-traumatic stress disorder - were not severe was not supported by substantial evidence on the record as a whole.  Specifically, plaintiff asserts that the ALJ ignored evidence from St. John's Clinic documenting complaints of depression and crying spells, a diagnosis of depression and anxiety and treatment at Pathways, and Dr. Mason's opinion that plaintiff suffered from fatigue, anxiety, and disabling depression.  Plaintiff contends that her depression and anxiety are more than slight abnormalities that "present more than a minimal effect of her ability [sic] to do basic work." (Docket No. 15 at 7).

Having reviewed the ALJ's decision and considered plaintiff's arguments, the undersigned concludes that substantial

evidence on the record as a whole supports the ALJ's finding that plaintiff's mental impairments were not severe.   In determining whether a claimant's mental impairments are "severe," the regulations require the ALJ to consider "four broad functional areas in which [the ALJ] will rate the degree of [the claimant's] functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."   20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The regulations further provide:

> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.
>
> 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

In the case at bar, the ALJ rated plaintiff's degree of limitation in the first three functional areas as "mild," and determined that she had no episodes of decompensation lasting  for an extended duration.  (Tr. 13-14).  The regulations provide that if a claimant's degree of limitation is rated as "none" or "mild" in the first three functional areas and "none" in the fourth area, she will generally be found to have no severe mental impairment. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1); see also Buckner v. Astrue, 646 F.3d 549, 557 (8th Cir. 2011) (the ALJ analyzed the evidence and determined that the claimant's depression and anxiety caused "no more than 'mild' limitation in any of the first 3

-43-

functional areas and 'no' limitation in the fourth area" and "[t]hus, pursuant to the regulations, the ALJ had substantial evidence supporting a conclusion that [the claimant's] depression and anxiety were 'not severe.'")

In the case at bar, as in Buckner, plaintiff does not challenge the ALJ's findings in these four functional areas, but instead argues that the evidence shows that her mental impairments have more than a minimal impact on her ability to do basic work activities. As noted above, however, the evidence of record shows that plaintiff's mental impairments caused very few limitations. As indicated by the above summary of the medical information of record, while plaintiff did complain of depression and crying spells in August of 2007, the balance of the St. John's records show that she did not consistently complain of psychological symptoms. The records also demonstrate that mental status examinations consistently failed to reveal evidence of any abnormality. When plaintiff was seen at Phelps County Regional Medical Center in March of 2007, she stated that she was not currently having problems with depression or anxiety, and her mood and affect were found to be normal upon examination. When plaintiff saw Dr. Mohsen on May 15, 2007, she denied depression, anxiety, or memory loss. In fact, plaintiff did not complain of an significant psychiatric symptoms until August 8, 2007 when she reported feeling depressed but stated that she did not like to take antidepressants, and was, for the first time indicated by the record, referred for mental health evaluation. In addition,

-44-

despite her psychological complaints, she was fully oriented with intact judgment, insight, and memory.  When she was evaluated at Pathways, she evidenced psychological complaints, but her continuity, orientation, and memory were within normal limits, and her attention, concentration, judgment, reason and insight were "fair."  When she was next seen at Pathways on October 29, 2007, the intensity of her panic and anxiety were described as "mild" and examination was within normal limits as described previously.

Other than these examinations, the record fails to reveal that plaintiff consistently sought mental health treatment for depression, anxiety, post-traumatic stress or any other psychological impairments during the relevant period.  The absence of ongoing counseling or psychiatric treatment, or of evidence of deterioration or change in mental capabilities, disfavors a finding of disability.  See Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (citing Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990)).  In addition, as discussed supra, the ALJ properly discounted plaintiff's credibility regarding her allegations of symptoms precluding all work, and properly determined to give less than controlling weight to Dr. Mason's opinion regarding plaintiff's psychological condition.  In sum, although plaintiff was diagnosed with depression, anxiety, and post-traumatic stress disorder, substantial evidence on the record as a whole supports the ALJ's determination that her mental impairments were not severe.  See Buckner, 646 F.3d at 557 (citing Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990) ("Depression . . . is not

necessarily disabling.")).

    D.   <u>Listed Impairments</u>

    In his decision, in determining that plaintiff did not meet or medically equal a listed impairment, the ALJ wrote,

> [t]he medical evidence does not have findings
> of loss of gait and station, nor are there
> findings of a lack of gross and fine
> manipulation. The claimant does not have
> consistent evidence of reflex loss, motor
> loss, sensory loss, muscle atrophy, or
> positive straight leg raising, or other
> findings that would meet the requirements of a
> listed musculoskeletal impairment.

(Tr. 14).

    Plaintiff contends that the ALJ erred when he determined that she did not have an impairment or combination of impairments that met or medically equaled a listed impairment, and suggests that the ALJ should have obtained expert opinion evidence. Plaintiff also complains that the ALJ "failed to even mention which listing or listings and appropriate requirements of those listings he considered in making his determination." In her brief, plaintiff cites Listing 1.02 (major dysfunction of a joint(s) (due to any cause) and 1.04 (disorders of the spine), and further states that she also suffers from fatigue, depression, anxiety, heart rhythm problems, pulmonary difficulties and GERD.

    "To qualify for disability under a listing, a claimant carries the burden of establishing that [her] condition meets or equals all specified medical criteria." <u>McCoy v. Astrue</u>, 648 F.3d 605, 611 (8th Cir. 2011) (citing <u>Marciniak v. Shalala</u>, 49 F.3d 1350, 1353 (8th Cir. 1995)); <u>see also</u> <u>Johnson v. Barnhart</u>, 390 F.3d

-46-

1067, 1070 (8th Cir.2004) (the burden is on the claimant to show
that she meets or equals listings requirements).   A claimant will
not be deemed to have met a listing merely because she has been
diagnosed with a condition named in a listing and meets some of the
criteria.   McCoy, 648 F.3d at 612 (citation omiitted); see also
Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("An impairment that
manifests only some of [the listing] criteria, no matter how
severely, does not qualify.")

In her brief, plaintiff cites § 1.02 and § 1.04, both of
which fall under the Category of Musculoskeletal Impairments.   The
primary elements of § 1.02 are: (1) a showing of anatomical
deformity, characterized by symptoms including subluxation and
instability; (2) chronic joint pain and stiffness with limitation
of motion or other abnormal motion of those joints; (3) imaging
revealing joint space narrowing, body destruction, or ankylosis of
the affected joints, with: (A) involvement of at least one major
weight-bearing joint, including hips, knees, or ankles resulting in
an inability to ambulate effectively; or (B) involvement of one
major peripheral joint in each upper extremity resulting in the
inability to perform fine and gross movements effectively.   20
C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.   Section 1.04 requires
evidence of nerve root compression causing motor loss with sensory
or reflex loss.   20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

As the ALJ noted, the record fails to document that
plaintiff consistently demonstrated the limitations of movement
required for her to prove that she meets the requirements of § 1.02

-47-

or § 1.04.  Plaintiff's medical treatment providers consistently
described her gait as normal, steady and coordinated; Dr. Mohsen
specifically wrote that plaintiff's coordination and reflexes were
normal, her motor strength was 5/5 in her upper extremities and 4/5
in her lower extremities, and she was not in pain during his
interview of her.  When she saw Dr. Martin in June of 2007, she
denied any muscle aches, joint tenderness, joint pain, or swelling,
and Dr. Martin noted that physical examination was normal and
revealed no findings in plaintiff's extremities.  In July of 2007,
examination revealed 5/5 motor strength in her upper extremities
and 4/5 strength in her lower extremities, and her reflexes were
symmetrical, but diminished.  In July of 2008, her gait was steady
and she was able to move all of her extremities without significant
limitation, and she demonstrated normal coordination and
symmetrical strength.  In 2009, plaintiff reported that she had
been walking "a mile or two at a time." (Tr. 407).  In 2010, her
sensation and deep tendon reflexes were intact.  To qualify for
disability under a listing, plaintiff was required to establish
that her condition(s) met or equaled all of the specified medical
criteria.  McCoy, 648 F.3d at 611.  She cannot be deemed to have
met a listing simply because she has certain diagnoses and meets
some of the specified criteria.  Id. at 612.

Plaintiff also contends that the ALJ erred because he
failed to mention the listings he considered.  This argument is
without merit.  First, the ALJ did specify the listings he had
considered when he wrote that he had determined that plaintiff did

-48-

not meet the requirements of a listed musculoskeletal impairment.
As the Commissioner correctly notes, this encompasses Listings 1.02
through 1.08.  See 20 C.F.R. Part 404, Subpart P, Appendix 1, §§
1.02 - 1.08.  In addition, as discussed above, the record supports
the ALJ's conclusion that plaintiff failed to establish all of the
criteria required for disability under a listing.  Karlix v.
Barnhart, 457 F.3d 742, 746 (8th Cir. 2006) (internal citations
omitted) (while an ALJ is required to consider evidence of listed
impairments and determine whether they meet or are equivalent to
any of the listed impairments, "[t]he fact that the ALJ d[oes] not
elaborate on this conclusion does not require reversal [where] the
record supports h[is] overall conclusion"); see also Moore ex rel.
Moore v. Barnhart, 413 F.3d 718, 721 n. 3 (8th Cir. 2005) (noting
that ALJ's failure to address specific listing is not reversible
error if record supports overall conclusion).

        Finally, to the extent Plaintiff can be understood to
challenge the ALJ's consideration of her impairments in
combination, the undersigned determines that there was no error.
The ALJ fully summarized all of plaintiff's medical treatment
records and the opinion evidence of record, and discussed each of
plaintiff's alleged impairments.   The ALJ wrote that he had
concluded that plaintiff did not have "an impairment or combination
of impairments that [met] or medically [equaled]" a listed
impairment.  (Tr. 12).  Based on the foregoing, the undersigned
finds that the ALJ sufficiently considered plaintiff's impairments

in combination.   See Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994) (conclusory statement that ALJ did not consider combined effects of impairments was unfounded where ALJ noted each impairment and found that impairments, alone or combined, were not of listing-level severity); see also Browning, 958 F.2d at 821(the ALJ sufficiently considered the claimant's impairments in combination by separately discussing the claimant's physical impairments, complaints of pain, and daily activities).   "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." Id. (citing Gooch v. Secretary of H.H.S., 833 F.2d 589, 592 (6th Cir. 1987)).

For all of the foregoing reasons, on the claims that plaintiff raises, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole.   Because the record contains substantial evidence supporting the Commissioner's decision, that decision must be affirmed even if, as plaintiff suggests, the record could have also supported the opposite decision.   Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones, 315 F.3d at 977.

Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's complaint is dismissed with prejudice.

_Frederick R. Buckles_

Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE


Dated this 15th day of March, 2012.